Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES ROGERS, derivatively on behalf of WELLS FARGO & COMPANY, | Case No.: |
| Plaintiff, | |
| v. | DEMAND FOR JURY TRIAL |
| | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| CHARLES W. SCHARF, MICHAEL P. SANTOMASSIMO, KLEBER R. SANTOS, CARLY SANCHEZ, STEVEN D. BLACK, MARK A. CHANCY, CELESTE A. CLARK, THEODORE F. CRAVER, JR., WAYNE M. HEWETT, MARIA R. MORRIS, RICHARD B. PAYNE, JR., JUAN A. PUJADAS, RONALD L. SARGENT, and SUZANNE M. VAUTRINOT, | |
| Defendants, | |
| and | |
| WELLS FARGO & COMPANY, a Delaware Corporation | |
| Nominal Defendant. | |

Plaintiff Charles Rogers ("Plaintiff"), by and through his undersigned attorneys, derivatively, and on behalf of nominal defendant Wells Fargo & Company ("Wells Fargo" or the "Company"), brings this derivative action against defendants Charles W. Scharf, Michael P. Santomassimo, Kleber R. Santos, Carly Sanchez, Steven D. Black, Mark A. Chancy, Celeste A. Clark, Theodore F. Craver, Jr., Wayne M. Hewett, Maria R. Morris, Richard B. Payne, Jr., Juan A. Pujadas, Ronald L. Sargent, Suzanne M. Vautrinot (collectively, the "Individual Defendants," and together with Wells Fargo, the "Defendants") for breaches of fiduciary duties as directors and/or officers of Wells Fargo and violations of Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and as to all other matters upon information and belief, based upon his attorneys' investigation, including, *inter alia*, an evaluation of: (i) Wells Fargo's publicly available documents; (ii) Wells Fargo's conference calls and press releases; (iii) Wells Fargo's filings made with the United States Securities and Exchange Commission ("SEC"); (iv) legal filings; (v) news publications; (vi) analyst reports pertaining to Wells Fargo; and (vii) information gathered on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF ACTION**

1.     This is a shareholder derivative action brought on behalf of Wells Fargo against the Individual Defendants for wrongdoing committed between February 24, 2021 and June 9, 2022 (the "Relevant Period").

2.     Wells Fargo is the fourth largest bank by held assets in the United States. As a large commercial bank, Wells Fargo provides banking, investment, mortgage, personal loans, education loans, credit cards, and other consumer and commercial finance products and services, both domestically and internationally.

3.      Over the last year, Wells Fargo has refined its business in certain sectors to increase revenue, such as promoting its credit cards issuances and building a more robust contactless payment program.

4.      Over the last year, Wells Fargo has also attempted to clean up the extensive fraud scandal the bank presided over for the last decade. Indeed, although only discovered in earnest in late 2016, Wells Fargo's misconduct began long ago.

5.      On September 8, 2016, Wells Fargo acknowledged that it had created millions of fraudulent accounts and opened hundreds of thousands of credit cards under its customers' names without customer knowledge or permission.

6.      From that day on, Wells Fargo sought to clean up the messes it, itself, created. The Company faced a plethora of violations including, but not limited to, a 2016 allegation by Company employees of retaliation practices against whistleblowers; a 2017 lawsuit for squeezing small businesses by overcharging via superfluous hidden charges; and a 2018 lawsuit brought by the City of Sacramento alleging discrimination against Black and Latino mortgagors.

7.      Since May 2018, Wells Fargo has had to shell out billions of dollars in settlements and fines for its varied and extensive scandals.

8.      One of the initiatives sought to improve Wells Fargo's corporate governance began in June 2020, when CEO Charles W. Scharf, after the civil unrest following the death of George Floyd, vowed to interview and hire more diverse job candidates.

9.      Specifically, in 2020, Wells Fargo instituted the Diverse Search Requirement, which mandated that at least half of Wells Fargo interviewees meet at least one criteria of diversity for jobs with compensation levels higher than $100,000 a year.  Diversity criteria, according to Wells Fargo, included considerations such as race, ethnicity, gender, sexual orientation, disability status, and veteran status.

10.     The Diverse Search Requirement additionally mandated that at least one interviewer sitting on a hiring panel be someone from these historically underrepresented groups.

11.     However, Wells Fargo fell far short of the diversity interviewing and hiring goals set forth by the Company and resorted to conducting sham interviews with minority candidates in order to artificially meet Company interviewing requirements.

12.     On May 19, 2022, the truth began to emerge when the *New York Times* reported that Wells Fargo did indeed conduct fake interviews with diverse candidates so that the Company could satisfy the Diverse Search Requirement.[1] The article featured a former Wells Fargo executive in the wealth management division named Joe Bruno who was allegedly fired in retaliation for blowing the whistle on the Company's practice of conducting sham interviews for diverse candidates.

13.     On this news, the price of Wells Fargo stock fell $0.33 per share, from $42.00 per share at close on May 19, 2022 to close at $41.67 per share on May 20, 2022.

14.     Shortly thereafter, on June 6, 2022, Reuters reported that Wells Fargo would pause use of its Diverse Search Requirement "after the New York Times reported such interviews were often fake and conducted even though the job had already been promised to someone else."[2]

15.     Just three days later, on June 9, 2022, the *New York Times* reported that federal prosecutors in the civil rights unit of the U.S. Attorney's office for the Southern District of New York opened a criminal investigation into Wells Fargo's discriminatory hiring practices.[3] The article revealed that since the publication of the May 19, 2022 story, ten

---

[1] Emily Flitter, "At Wells Fargo, a Quest to Increase Diversity Leads to Fake Job Interviews," *N.Y. Times* (May 19, 2022) (last visited Sept. 16, 2022), https://www.nytimes.com/2022/05/19/business/wells-fargo-fake-interviews.html.

[2] "Wells Fargo pauses diverse slate hiring policy after reports of fake job interviews" *Reuters* (June 6, 2022, 7:02PM EST) (last visited Sept. 16, 2022), https://www.reuters.com/business/wells-fargo-pauses-diverse-slate-hiring-policy-after-reports-fake-job-interviews-2022-06-06/.

[3] Emily Flitter, "Federal Prosecutors Open Criminal Inquiry of Wells Fargo's Hiring Practices," *N.Y. Times* (June 9, 2022) (last visited Sept. 16, 2022), https://www.nytimes.com/2022/06/09/business/wells-fargo-fake-interviews-investigation.html.

current and former employees came forward to corroborate the allegations of conducting fake interviews, or at a minimum, witnessed "paperwork documenting the practice."

16.     In particular, prosecutors are investigating whether Wells Fargo violated federal law by holding sham interviews to meet the Company's Diverse Search Requirement and retaliated against employees by terminating them for speaking up against these unethical practices (the "Discrimination Misconduct").

17.     That same day, June 9, 2022, Wells Fargo published a press release stating that the Company paused its Diverse Search Requirement so that a review could be completed "so that hiring managers, senior leaders and recruiters fully understand how the guidelines should be implemented."

18.     Not long after Wells Fargo's press release announcing the suspension of the Diverse Search Requirement, the price of Wells Fargo stock fell $3.68, or 8.62%, from $42.67 per share at close on June 9, 2022 to close at $38.99 per share on June 13, 2022.

19.     Wells Fargo reported in its most recent Form 10-Q filed with the SEC on August 1, 2022 that the company is subject to ongoing investigations into its hiring practices by government agencies, including the Department of Justice ("DOJ").

20.     During the Relevant Period, the Individual Defendants breached their fiduciary duties to Wells Fargo by making and/or causing the Company to make to the investing public a series of materially false and misleading statements about the company's diverse hiring practices. Specifically, the Individual Defendants willfully or recklessly made and/or caused Wells Fargo to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) Wells Fargo did not abide by its own diverse hiring procedures and was actively deceiving the public about the Company's commitment to workplace diversity; (2) Wells Fargo performed the Discrimination Misconduct; (3) as a result, misconduct Wells Fargo would be subject of an ongoing criminal investigation; (4) as a result, the foregoing circumstances would tarnish Wells Fargo's reputation and stature as an institution; and (5) Wells Fargo failed to maintain

adequate internal controls. Consequently, Wells Fargo's public statements were materially false and misleading at all relevant times.

21.    The Individual Defendants also breached their fiduciary duties by failing to correct and/or preventing the Company from correcting these false and misleading statements and omissions of material fact to the investing public. The Individual Defendants further breached their fiduciary duties by causing Wells Fargo to repurchase its own stock at artificially inflated rates. Indeed, between February 2021 and June 2022, approximately 405 million shares of Wells Fargo common stock were repurchased, costing the Company almost $19.9 billion. Since the repurchased stock was only worth $38.99 per share, which was the price at close of trading on June 13, 2022, Wells Fargo overpaid by almost $4.1 billion.

22.    Egregiously, Defendant Kleber R. Santos ("Santos") further breached his fiduciary duties by engaging in insider trading of Wells Fargo common stock at artificially inflated rates. Defendant Santos's insider trading netted him profits in excess of $1 million.

23.    In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), its Senior Executive Vice President ("EVP") and Head of Diverse Segments, and its EVP of Talent Acquisition and Diversity Recruiting to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Class Action"), and has subjected Wells Fargo to a criminal investigation, the need to resolve the Discrimination Misconduct, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

24.    Demand is excused as Wells Fargo's Board of Directors (the "Board") cannot consider a demand to initiate litigation against themselves and the other Individual

Defendants on behalf of the Company with the requisite level of disinterestedness and independence required. In light of the Individual Defendants', most of whom are Wells Fargo's current directors, breaches of fiduciary duty, their collective participation in fraud, the substantial likelihood of their liability in this derivative action as well as Defendant Scharf and Defendant Santomassimo's liability in the Class Action, the Individual Defendants being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of the Board cannot consider a demand.

## JURISDICTION AND VENUE

25.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

26.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

27.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

28.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

29.    Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

30.    The court has personal jurisdiction over each Defendant because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she has, directly or indirectly, used the means and instrumentalities of

interstate commerce, some of which are, the mails, interstate telephone communications, and the facilities of the national securities markets.

31.    Venue is proper in this Judicial District because Wells Fargo is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

## THE PARTIES

**Plaintiff Rodgers**

32.    Plaintiff Rogers is a current Wells Fargo stockholder who has continuously held Wells Fargo stock since before the beginning of the Relevant Period.

**Defendant Scharf**

33.    Defendant Charles W. Scharf ("Scharf") serves as Wells Fargo's CEO, President, and as a Director since October 2019. Defendant Scharf is also a named defendant in the Class Action. As of February 23, 2022, Defendant Scharf held 316,771 shares of Wells Fargo common stock. At the close of trading on February 23, 2022, Wells Fargo's stock price was $53.95 per share, thus Defendant Scharf owned approximately $17.1 million of Wells Fargo stock.

34.    Defendant Scharf's compensation for the 2021 fiscal year, that ended on December 31, 2021 ("FY 2021"), was $24,500,000, of which $16,634,146 was in stock awards.

35.    Upon information and belief, Defendant Scharf is a citizen of New York.

**Defendant Santomassimo**

36.    Defendant Michael P. Santomassimo ("Santomassimo") is and has been Wells Fargo's CFO and Senior EVP since September 2020. As of February 23, 2022, Defendant Santomassimo held 68,249 shares of Wells Fargo common stock. At the close of trading on February 23, 2022, Wells Fargo's stock price was $53.95 per share, thus Defendant Santomassimo owned approximately $3.7 million of Wells Fargo stock.

37.     Defendant Santomassimo's compensation for FY 2021 was $11,462,500, of which $7,875,000 was in stock awards.

38.     Upon information and belief, Defendant Santomassimo is a citizen of New Jersey.

**Defendant Santos**

39.     Defendant Kleber R. Santos ("Santos") is and has been Wells Fargo's Senior EVP and CEO of Consumer Lending and Head of Diverse Segments, Representation, and Inclusion since November 2020.

40.     On May 3, 2022, during the Relevant Period, Defendant Santos sold 22,700 shares of Wells Fargo common stock at an average price per share of $44.44 for a net profit of $1,008,788. Defendant Santos engaged in insider trading with these sales, as the sales were made with knowledge of material nonpublic information because the sales occurred before the material misstatements and omissions referenced herein were made public. Defendant Santos' insider trading demonstrates his motive in facilitating and participating in the scheme.

41.     Upon information and belief, Defendant Santos is a citizen of Virginia.

**Defendant Sanchez**

42.     Defendant Carly Sanchez ("Sanchez") is and has been Wells Fargo's EVP of Talent Acquisition, Affirmative Action, Equal Employment Opportunity, and Diversity Recruiting since September 2013.

43.     Upon information and belief, Defendant Sanchez is a citizen of California.

**Defendant Black**

44.     Defendant Steven D. Black ("Black") is and has been a Director since April 2020. In August 2021, he was elected Chairman of the Board and Chair of the Finance Committee. As of February 23, 2022, Defendant Black held 19,037 shares of Wells Fargo common stock. At the close of trading on February 23, 2022, Wells Fargo's stock price

was $53.95 per share, thus Defendant Black owned approximately $1.1 million of Wells Fargo stock.

45.     Defendant Black's compensation for FY 2021 was $428,900, of which $180,044 was in stock awards.

46.     Upon information and belief, Defendant Black is a citizen of Michigan.

**Defendant Chancy**

47.     Defendant Mark A. Chancy ("Chancy") is and has been a Director of Wells Fargo's Board since August 2020. Defendant Chancy also serves as a member of the Finance Committee, Audit Committee, Risk Committee, and Credit Subcommittee. As of February 23, 2022, Defendant Chancy held 16,379 shares of Wells Fargo common stock. At the close of trading on February 23, 2022, Wells Fargo's stock price was $53.95 per share, thus Defendant Chancy owned approximately $883,647 of Wells Fargo stock.

48.     Defendant Chancy's compensation for FY 2021 was $357,044, of which $180,044 was in stock awards.

49.     Upon information and belief, Defendant Chancy is a citizen of Georgia.

**Defendant Clark**

50.     Defendant Celeste A. Clark ("Clark") is and has been a Director of Wells Fargo's Board since January 2018. Defendant Clark also serves as the Chair of the Corporate Responsibility Committee and as a member of the Governance and Nominating Committee. As of February 23, 2022, Defendant Clark held 29,543 shares of Wells Fargo common stock. At the close of trading on February 23, 2022, Wells Fargo's stock price was $53.95 per share, thus Defendant Clark owned approximately $1.6 million of Wells Fargo stock.

51.     Defendant Clark's compensation for FY 2021 was $342,044, of which $180,044 was in stock awards.

52.     Upon information and belief, Defendant Clark is a citizen of Michigan.

**Defendant Craver**

53.     Defendant Theodore F. Craver, Jr. ("Craver") is and has been a Director of Wells Fargo's Board since January 2018. Defendant Craver also serves as the Chair of the Audit Committee and as a member of the Finance and Governance & Nominating Committees. As of February 23, 2022, Defendant Craver held 30,797 shares of Wells Fargo common stock. At the close of trading on February 23, 2022, Wells Fargo's stock price was $53.95 per share, thus Defendant Craver owned approximately $1.7 million of Wells Fargo stock.

54.     Defendant Craver's compensation for FY 2021 was $378,211, of which $180,044 was in stock awards.

55.     Upon information and belief, Defendant Craver is a citizen of California.

**Defendant Hewett**

56.     Defendant Wayne M. Hewett ("Hewett") is and has been a Director of Wells Fargo's Board since January 2019. Defendant Hewett also serves as the Chair of the Governance and Nominating Committee and as a member of the Corporate Responsibility Committee, Human Resources  and Risk Committees. As of February 23, 2022, Defendant Hewett held 26,660 shares of Wells Fargo common stock. At the close of trading on February 23, 2022, Wells Fargo's stock price was $53.95 per share, thus Defendant Hewett owned approximately $1.4 million of Wells Fargo stock.

57.     Defendant Hewett's compensation for FY 2021 was $354,923, of which $180,044 was in stock awards.

58.     Upon information and belief, Defendant Hewett is a citizen of Illinois.

**Defendant Morris**

59.     Defendant Maria R. Morris ("Morris") is and has been a Director of Wells Fargo's Board since January 2018. Defendant Morris also serves as the Chair of the Risk Committee and as a member of the Human Resources Committee. As of February 23, 2022, Defendant Morris held 19,581 shares of Wells Fargo common stock. At the close of trading

on February 23, 2022, Wells Fargo's stock price was $53.95 per share, thus Defendant Morris owned approximately $1.1 million of Wells Fargo stock.

60.     Defendant Morris's compensation for FY 2021 was $440,044, of which $180,044 was in stock awards.

61.     Upon information and belief, Defendant Morris is a citizen of New York.

**Defendant Payne**

62.     Defendant Richard B. Payne, Jr. ("Payne") is and has been a Director of Wells Fargo's Board since October 2019. Defendant Payne also serves as a member of the Risk Committee and the Credit Subcommittee. As of February 23, 2022, Defendant Payne held 13,231 shares of Wells Fargo common stock. At the close of trading on February 23, 2022, Wells Fargo's stock price was $53.95 per share, thus Defendant Payne owned approximately $713,812 of Wells Fargo stock.

63.     Defendant Payne's compensation for FY 2021 was $349,211, of which $180,044 was in stock awards.

64.     Upon information and belief, Defendant Payne is a citizen of Minnesota.

**Defendant Pujadas**

65.     Defendant Juan A. Pujadas ("Pujadas") is and has been a Director of Wells Fargo's Board since September 2017. Defendant Pujadas also serves as a member of the Finance Committee and the Risk Committee. As of February 23, 2022, Defendant Pujadas held 19,813 shares of Wells Fargo common stock. At the close of trading on February 23, 2022, Wells Fargo's stock price was $53.95 per share, thus Defendant Pujadas owned approximately $1.1 million of Wells Fargo stock.

66.     Defendant Pujadas's compensation for FY 2021 was $383,044, of which $180,044 was in stock awards.

67.     Upon information and belief, Defendant Pujadas is a citizen of California.

**Defendant Sargent**

68.     Defendant Ronald L. Sargent ("Sargent") is and has been a Director of Wells Fargo's Board since February 2017. Defendant Sargent also serves as the Chair of the Human Resources Committee and as member of the Audit Committee and Governance & Nominating Committee. As of February 23, 2022, Defendant Sargent held 64,426 shares of Wells Fargo common stock. At the close of trading on February 23, 2022, Wells Fargo's stock price was $53.95 per share, thus Defendant Sargent owned approximately $3.5 million of Wells Fargo stock.

69.     Defendant Sargent's compensation for FY 2021 was $374,044, of which $180,044 was in stock awards.

70.     Upon information and belief, Defendant Sargent is a citizen of Ohio.

**Defendant Vautrinot**

71.     Defendant Suzanne M. Vautrinot ("Vautrinot") is and has been a Director of Wells Fargo's Board since February 2015. Defendant Vautrinot also serves as a member of the Corporate Responsibility Committee and the Risk Committee. As of February 23, 2022, Defendant Vautrinot held 30,994 shares of Wells Fargo common stock. At the close of trading on February 23, 2022, Wells Fargo's stock price was $53.95 per share, thus Defendant Vautrinot owned approximately $1.7 million of Wells Fargo stock.

72.     Defendant Vautrinot's compensation for FY 2021 was $337,044, of which $180,044 was in stock awards.

73.     Upon information and belief, Defendant Vautrinot is a citizen of Texas.

**Nominal Defendant Wells Fargo**

74.     Wells Fargo is a San Francisco, California-based Delaware corporation. The Company's principal executive offices are situated at 420 Montgomery Street, San Francisco, California. Wells Fargo's shares trade on the New York Stock Exchange ("NYSE") under the ticker "WFC."

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Company Overview

75.    Wells Fargo is a San Francisco, California-based Delaware corporation. Wells Fargo provides banking, investment, mortgage, personal loans, education loans, credit cards, and other consumer and commercial finance products and services, both domestically and internationally.

76.    Wells Fargo is the fourth largest bank in the United States by total assets, controlling $1.71 trillion. Wells Fargo offers investment services through its subsidiaries, "Wells Fargo Investments, LLC" and "Wells Fargo Advisors LLC," as well as through other national firms.

77.    Wells Fargo has experienced several recent scandals and governmental investigations in the stemming from poor corporate governance, among others: a 2016 allegation by Company employees of retaliation practices against whistleblowers; a 2017 lawsuit for squeezing small businesses by overcharging via superfluous hidden charges; and a 2018 lawsuit brought by the City of Sacramento alleging discrimination against Black and Latino mortgagors.

### The Discrimination Misconduct

78.    In March 2020, Wells Fargo launched its Diverse Search Requirement. The new policy mandated a two-pronged assault on inequality in the workplace: (1) first, at least half of the candidates interviewed for jobs with a salary over $100,000 be diverse; and second (2) one interviewer on the hiring panel represent at least one diverse group.

79.    The proxy statement filed on Schedule 14A with the SEC on March 16, 2021 (the "2021 Proxy"), outlined the new policy in detail:

> The Diverse Search Requirement requires the following for most U.S. roles with total direct compensation greater than $100,000:
> - At least 50% of interview candidates must be diverse with respect to at least one diversity dimension; and
> - At least one interviewer on the hiring panel must represent at least one diversity dimension.

80.     A few months later, in November 2020, Wells Fargo tapped Defendant Santos to fill the newly founded role of Head of Diverse Segments, Representation and Inclusion. In this role, Defendant Santos reported directly to the CEO about the Diversity, Equity & Inclusion ("Diversity & Inclusion") policies deployed throughout the Company.

81.     Defendant Santos was primarily tasked to work with the CEO and the Company's management-level Operating Committee to increase diversity in Wells Fargo's workforce.

82.     The CEO and the Operating Committee directly supervised the Diversity & Inclusion policies implemented by Wells Fargo and were responsible for increasing diversity at the Company.

83.     Per the 2022 Proxy Statement ("2022 Proxy"), the Human Resources Committee of the Board of Directors is responsible for overseeing Diversity & Inclusion. According to the 2022 Proxy:

> The Board and its Human Resources Committee receive regular reports relating to the Company's DE&I initiatives, which include updates on the Company's progress and accomplishments across our DE&I commitments and the development and launch of new programs, including information relating to (1) talent acquisition and development, (2) sponsorship events, (3) Operating Committee leader engagement, including with our Team Member Networks and DE&I Councils, (4) supplier diversity, and (5) diversity reporting, including information on diverse representation. Our directors also obtain feedback directly from stakeholders, including members of our external Stakeholder Advisory Council who provide their constructive perspectives on the impact of the Company's actions and initiatives on nonwhite stakeholders and communities of color.

84.     Wells Fargo frequently publicly touted its adherence to its Diverse Search Requirement.

85.     In May 2022, despite the public veneer, current and former Wells Fargo employees began to reveal the unfortunate reality of the diversity program,[4] stating the Company conducted sham interviews for diverse candidates to falsely satisfy the Diverse

---

[4] https://www.nytimes.com/2022/05/19/business/wells-fargo-fake-interviews.html

Search Requirement. Former Company employees who spoke to the *New York Times* further revealed that diverse candidate interviews of diverse candidates were focused on maintain a positive public appearance instead of actually putting the policy into practice.

86.    In addition, high-ranking, long tenured employees, such as Joe Bruno, were fired for objecting to the illegitimate scheme. For example, Joe Bruno worked at Wells Fargo since 2000 and eventually rose to an executive-level position in the wealth management division. Bruno told the *New York Times* he was told to bring on black job candidates for lower compensation jobs, like financial consultants.[5]

87.    Bruno revealed that hiring managers at Wells Fargo told him to interview diverse candidates for jobs that were already filled.[6] Eventually, Bruno could not maintain the unethical practice and therefore refused to conduct interviews.[7]

88.    Bruno was one of seven current and former Wells Fargo employees that maintain they were told by "direct bosses or human resources managers in the bank's wealth management unit to interview "diverse" candidates — even though the decision had already been made to give the job to another candidate. Five others said they were aware of the practice, or helped to arrange it."

89.    The employees maintain that Wells Fargo did not intend to improve diversity, and instead merely conducted diverse-candidate interviews to establish a paper trail of diversity hiring practices.

90.    However, this was not the first occasion Wells Fargo was accused of discriminatory practices. Approximately two years earlier, in 2020, Wells Fargo paid $7.8 million to the Department of Labor to remedy allegations that it discriminated against 34,193 Black job applicants.

---

[5] Alexandra Jane, "Wells Fargo Accused of Conducting Fake Interviews To Report an Increase in Diversity Hiring Efforts," The Root, May 22, 2022, https://www.theroot.com/wells-fargo-accused-of-conducting-fake-interviews-to-re-1848960805 (last visited Sept. 23, 2022).
[6] Emily Flitter, "At Wells Fargo, a Quest to Increase Diversity Leads to Fake Job Interviews," N.Y. Times May 19, 2022, https://www.nytimes.com/2022/05/19/business/wells-fargo-fake-interviews.html (last visited Sept. 23, 2022).
[7] Alexandra Jane, "Wells Fargo Accused of Conducting Fake Interviews To Report an Increase in Diversity Hiring Efforts," The Root, May 22, 2022, https://www.theroot.com/wells-fargo-accused-of-conducting-fake-interviews-to-re-1848960805 (last visited Sept. 23, 2022).

91.    In 2013, the Company shelled out $36 million resulting from a race discrimination lawsuit brought by black Wells Fargo employees.

92.    With this history in mind when Wells Fargo's Discrimination Misconduct surfaced in 2022, the U.S. Attorney's office for the Southern District of New York launched an investigation into possible criminal conduct at Wells Fargo. Wells Fargo acknowledged the investigation in its quarterly report on Form 10-Q filed with the SEC on August 1, 2022, for the fiscal quarter ended June 30, 2022.

93.    In reaction to the news and subsequent investigations, in June 2022, Wells Fargo halted its Diverse Search Requirement. However, just two months later, in August 2022, Wells Fargo reinstated the Diverse Search guidelines, alleging that it had improved the diversity hiring guidelines.

**The Individual Defendants' Knowledge of the Discrimination Misconduct**

94.    During the Relevant Period, the Board, through the Director-Defendants, approved a new position within the Operating Committee called the "Head of Diverse Segments, Representation, & Inclusion." This newly created role was tasked with improving diversity in the workplace and reported directly to the CEO, Defendant Scharf, and the Human Resources Committee.

95.    Defendant Santos received the Head of Diverse Segments, Representation, & Inclusion job. Therefore, Defendant Santos carried the responsibility of reporting the Diversity & Inclusion initiatives to Defendants Sargent, Hewett, and Morris, who constituted the Human Resources Committee. The Human Resources Committee then relayed the Diversity & Inclusion initiatives to the full Board.

96.    In light of these responsibilities, the Director-Defendants neglected their duties and failed to oversee Wells Fargo's Diverse Search Requirement and evaluate the Company's performance regarding improving diversity. The Board's misconduct thrusted the Company into another lawsuit – the Securities Class Action.

**Shareholder Initiatives to Improve Diversity at Wells Fargo**

97.     The Director-Defendants knew of problems at Wells Fargo relating to diversity shortcomings. According to the Company's 2021 Proxy, a group of Wells Fargo shareholders submitted two proposals, the first of which requested the Company implement a Racial Equity Audit ("Shareholder Initiative 1").

98.     Despite the shareholders' urging, the Board recommended to vote against this proposal. Instead, the Board proclaimed there were "adequate" steps being already taken. The Board further replied that it was conducting a Human Rights Impact Assessment to determine racial equity at the Company. This initiative was to be completed by the Board's Corporate Responsibility Committee, which was composed of Defendant Clark as Chair, and Defendant Hewett and Vautrinot as members.

99.     The second shareholder proposal sought to bolster Wells Fargo's Diverse Search Requirement ("Shareholder Initiative 2"). The Board responded to this proposal by requesting to remove it from the 2021 Proxy. The proposal asked "Wells Fargo & Company (the 'Company') [to] adopt a policy for improving workforce diversity by requiring that the initial pool of candidates from which new employees are hired by the Company in the U.S. shall include at least one qualified woman and one ethnically or racially diverse candidate (a 'Diverse Candidate Search Policy')."

100.    On January 21, 2021, Wells Fargo's Board requested to remove Shareholder Initiative 2 because they believed the Company has already "Substantially implemented the proposal." The Board further elaborated:

> The Company's leadership has indicated its commitment to advancing diversity, equity, and inclusion as well as fostering a Company culture that deeply values and respects diversity and inclusion within the Company. The Company believes that it has taken meaningful steps in 2020 to meet this commitment. While the Company is encouraged by early progress, the Company also recognizes there is more work to do on this issue.

101.    The Board continued:

**The Company's Board of Directors (the "Board") reviewed and supported the Diverse Search Requirement in connection with its review of disclosure relating to the requirement contained in the Company's proxy statement that was filed in March 2020 for its 2020 Annual Meeting of Shareholders.**

Subsequently, consistent with the responsibilities reflected in its charter, the **Human Resources Committee of the Board reviewed and approved the performance goals for the Company's Chief Executive Officer ("CEO") and President in June 2020, and which included an objective relating to the advancement of diversity and inclusion company-wide with actions that are measurable and for which leaders are accountable, as well as reviewed a performance goal for members of the Operating Committee** (which is comprised of the Company's senior management team) in July 2020 to lead the advancement of diversity and inclusion efforts across the Company by driving actions to deliver against Company commitments, including the Diverse Search Requirement. The Company has represented that under the Diverse Search Requirement, at least 50% of candidates on the interview slate for covered roles in the United States must be diverse with respect to at least one of the following diversity dimensions: race/ethnicity; gender; LGBTQ; veterans; and people with disabilities. This 50% diverse representation requirement is stricter than requested by the Proposal and applies to the initial interview slate, not just the initial pool of candidates, for a covered role.

102. The Individual Defendants knew Wells Fargo had a history of discriminatory practices and discriminatory lawsuits. Just in 2020, the Company shelled out $7.8 million to the Department of Labor to remedy allegations that Wells Fargo discriminated against 34,193 Black applicants and a few years earlier, in 2013, the Company lost $36 million in a race discrimination lawsuit filed by African American employees.

103. The Individual Defendants possessed further knowledge that the prior aforementioned lawsuits were the driving force behind Wells Fargo's Diverse Search Requirement. The Board publicized this initiative in the Company's 2021 Proxy and 2022 Proxy, thereby indicating that the Board oversaw the implementation and progress of these policies.

104. Coupled with Wells Fargo's fraught history of discriminatory practices and discrimination settlements that include but are not limited to racially discriminating against

loan applicants, illegally suppressing property values in minority areas, and engaging in gender and race hiring discrimination in the bank's locations across the country, the Board was required to be prudent, conscious, and diligent. In other words, the Board had a heightened responsibility to prevent Wells Fargo from engaging in discriminatory conduct again.

105.   The Board disregarded its duty, failed to maintain adequate oversight over the Company's Diversity & Inclusion Program, and as a result, subjected the Company to another lawsuit – the Securities Class Action.

106.   The Board's oversight failure and Discrimination Misconduct has also led to the launch of a criminal investigation by the DOJ and other governmental agencies.

107.   Furthermore, the Human Resources Committee annually reviewed Defendant Scharf's performance and the Operating Committee's performance for implementing the Diversity & Inclusion Program.

108.   The Individual Defendants also failed to ensure discrimination complaints lodged by employees were considered seriously. For instance, Defendant Santos and Defendant Sanchez, were aware of sham interviews and illegitimate hiring practices occurring throughout Wells Fargo. Despite their knowledge, Defendant Santos and Defendant Sanchez failed to investigate.

109.   Through their breaches of fiduciary duties, the Individual Defendants engaged in and/or permitted the Company and certain of the Individual Defendants to engage in the Discrimination Misconduct, subjecting the Company to lawsuits and governmental investigations, including an ongoing criminal investigation.

110.   The Director-Defendants asked the shareholders to vote against Shareholder Proposal 1 and Shareholder Proposal 2. The goal of these proposals was to remedy the Discrimination Misconduct itself. Yet, the Director-Defendants knowingly and willingly recommended to remove such proposals or vote against them, claiming that "adequate" practices were already in place.

111.    Thus, the Individual Defendants knew, or recklessly disregarded, the Company's nonadherence to the Diversity Search Requirement and the Company's illegitimate practice of conducting sham interviews to meet Wells Fargo's touted diversity requirements. Consequently, the Individual Defendants failed to uphold basic duties and responsibilities. Each Individual Defendant either was directly involved with implementing these policies or had an oversight responsibility on the implementation and practices surrounding these policies.

**False and Misleading Statements**

**February 23, 2021 Form 10-K**

112.    On February, 23, 2021, Wells Fargo filed its annual report on Form 10-K with the SEC for quarter and year ended December 31, 2020 (the "2020 10-K"). Defendants Scharf, Santomassimo, Black, Chancey, Clark, Craver, Hewett, Morris, Payne, Pujadas, Sargent and Vautrinot signed the 2020 10-K. The 2020 10-K contained Sarbanes-Oxley Act of 2002 ("SOX") certifications signed by Defendants Scharf and Santomassimo attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

113.    The 2020 10-K professed, "[i]n 2020, we introduced a new set of expectations for everyone at the Company", including, among other things, "[c]hampion[ing] diversity and inclusion", which "guide how we lead ourselves, collaborate with our colleagues, and make decisions", and which "apply to everyone at Wells Fargo, at every level, and in every role[.]"

114.    The 2020 10-K further professed Wells Fargo's dedication to diversity, in relevant part:

> Meeting the increasingly diverse needs of Wells Fargo's global customer base is critical to our company's long-term growth and success. Wells Fargo values and promotes diversity, equity and inclusion in every aspect of our business. We are dedicated to recruitment and career development practices that support our employees and promote diversity in our workforce at all levels of our

Company, including leadership positions. We have a strong record of recruiting, promoting, and rewarding women and racially/ethnically diverse employees at all levels of our Company, including a commitment to increase diverse representation in leadership roles.

115. The Individual Defendants tried to demonstrate that Wells Fargo had successfully implemented its expanded Diverse Search Requirement by stating in the 2020 10-K, in relevant part, that on December 31, 2020, "[o]ur global workforce was 54% female and 46% male, and our U.S. workforce was 56% female and 44% male", and that "[o]ur U.S. workforce was 55% Caucasian/white and 45% racially/ethnically diverse."

**March 16, 2021 Proxy Statement**

116. On March 16, 2021, the Company filed the 2021 Proxy. Defendants Scharf, Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, Sargent, and Vautrinot solicited the 2021 Proxy which contained material misstatements and omissions.

117. The 2021 Proxy stated, *inter alia*, that "[i]n the U.S., we are requiring a diverse slate of candidates – and a diverse interview team – for most roles with total direct compensation of more than $100,000 per year."

118. Furthermore, the 2021 Proxy mentioned the following regarding the Wells Fargo's diverse candidate sourcing and interview guidelines under its Diverse Search Requirement:

> Consistent with our commitment to advance diversity, equity, and inclusion (DE&I) and improve workforce diversity, Wells Fargo has established Diversity Sourcing and Interview Team Guidelines that require diverse candidate slates and interview teams (referred to as our Diverse Search Requirement). Our Diverse Search Requirement was originally implemented based on our evaluation of the Company's workforce in order to determine how best to improve workforce diversity. Based on our ongoing review, the Company decided to expand the scope of the Diverse Search Requirement in 2020 as part of our overall and continuing efforts to enhance workforce diversity. We define diversity for these purposes to include the following diversity dimensions: race/ethnicity, gender, LGBTQ, veterans, and people with disabilities.

The Diverse Search Requirement requires the following for most U.S. roles with total direct compensation greater than $100,000:

- At least 50% of interview candidates must be diverse with respect to at least one diversity dimension; and
- At least one interviewer on the hiring panel must represent at least one diversity dimension.

119.    Additionally, the 2021 Proxy stated with further respect to Wells Fargo's Diverse Search Requirement, in relevant part:

Based on our evaluation of our workforce composition, the Company determined that roles with total direct compensation above $100,000 presented the greatest opportunity for improving diverse representation at the Company. For roles with total direct compensation less than $100,000, we have observed a historically higher level of diversity. As of December 31, 2020, the scope of the Diverse Search Requirement would have covered:

- Approximately 95% of all U.S. roles with total direct compensation greater than $100,000; and
- Approximately 48% of all active U.S. employees irrespective of their total direct compensation.

These roles include senior management roles reporting to our CEO as well as job postings for covered U.S. roles, regardless of whether the candidates are internal or external . . .

120.    The 2021 Proxy mentioned how Wells Fargo enforced its Diverse Search Requirement, and stated, in relevant part:

Any exceptions to the Diverse Search Requirement must be approved by an Operating Committee member or one of their direct reports (or their assigned delegate). In order to obtain approval for an exception, hiring managers must show that sufficient outreach efforts were made (including the use of a variety of sourcing activities to identify diverse candidates) and that despite those efforts, they were unable to meet the Diverse Search Requirement.

121.    The 2021 Proxy stated the following with regards to New Operating Committee Role and Clear Accountability of Operating Committee Members for Diversity & Inclusion efforts:

Wells Fargo created a new Operating Committee role, the Head of Diverse Segments, Representation & Inclusion, that reports to the CEO. Kleber Santos joined Wells Fargo in November 2020 in this role and is responsible for advancing the Company's DE&I efforts in the marketplace and workplace. In

22

Verified Shareholder Derivative Complaint

this role, he will drive a Company-wide diverse segments strategy and partner with our line of business CEOs and diverse segment teams to deliver products and services designed to meet the needs of our diverse customer base.

Together with our CEO and other Operating Committee members, including our Head of Human Resources, Mr. Santos and his team are promoting and enhancing DE&I priorities and goals within the Company and externally that include a focus on diverse workforce representation (including significantly increasing Black leadership), accountability of senior management for progress in improving diverse representation and inclusion, unconscious bias education and training, and new business initiatives focused on support for diverse communities. As part of the Company's DE&I efforts, senior management meets with our most senior racially diverse executives to obtain their guidance on priorities and initiatives to enhance our career advancement opportunities and our overall racial equity efforts.

As part of the year-end performance evaluation and compensation decision process, Operating Committee members were evaluated based upon their progress in improving diverse representation and inclusion in their area of responsibility.

122.   With respect to the Company's Code of Conduct, the 2021 Proxy stated that: "Our Code of Ethics and Business Conduct [is] applicable to our employees, including our executive officers, and directors." It further states that:

At Wells Fargo, we expect all employees to Do What's Right by customers, stakeholders, and each other. Our Code of Ethics and Business Conduct provides additional clarity and focus on the ethical behavior we expect of all employees and members of our Board. The Code is supported by underlying policies as well as by interactive online training that all employees complete annually. Members of the Board also acknowledge annually that they have read and understand their obligations under the Code of Ethics and Business Conduct. It is critical for employees to understand our expectations and always do what is right. Employees also need to be comfortable speaking up with no fear of retaliation if they have a concern or see something that does not seem quite right.

123.   With regards to the Company's Non-Retaliation Policy, the 2021 Proxy states that:

Wells Fargo does not tolerate retaliation of any kind. Our employees' dedication and integrity are key to building a Wells Fargo we can all be proud

of, and our leadership believes that it is critical everyone feels safe raising concerns and cooperating with investigations without fear of retaliation or other negative actions, such as harassment or unprofessionalism. By speaking up when they have a concern, our employees offer a courageous and vital contribution to Wells Fargo's ethical working environment. Every employee's voice matters, regardless of his/her/their role, position in the Company, or location. Our Speak Up and Non-Retaliation Policy requires all employees to adhere to the Code of Ethics and Business Conduct and supporting policies, recognize unethical behavior, and report suspected unethical or illegal conduct. The policy also sets additional expectations for managers to guard against retaliatory conduct, watch for signs of retaliation, and report any conduct that may violate policies. To report a concern, employees may talk to a manager, contact Employee Relations, or contact our confidential EthicsLine.

124.   Regarding the "Board of Directors' Oversight Role in Diversity & Inclusion initiatives," the 2021 Proxy said:

The Board and its Human Resources Committee oversee the Company's Diversity, Equity, and Inclusion (DE&I) efforts and progress. The Human Resources Committee receives updates relating to the Company's DE&I initiatives and, beginning in the Fall of 2020, the full Board has received DE&I updates at each of its regularly scheduled Board meetings. These reports provide updates on the Company's progress and accomplishments across our DE&I commitments and the development and launch of new programs, including information relating to:
- Talent acquisition and development
- Sponsorship events
- Operating Committee leader engagement, including with our Team Member Networks and DE&I councils
- Supplier diversity
- Diversity reporting, including information on diverse representation

125.   Regarding the "Board of Directors' Role in Risk Oversight," the 2021 Proxy said:

**Role of the Board**
The Board oversees the Company's business, including its risk management. The Board assesses management's performance, provides credible challenge, and holds management accountable for maintaining an effective risk management program and for adhering to risk management expectations.

**Board Committee Structure**

The Board carries out its risk oversight responsibilities directly and through its committees. All of these committees report to the full Board about committee activities, including risk oversight matters and are comprised solely of independent directors. Each Board committee has defined authorities and responsibilities for primary oversight of specific risks, as outlined in its charter, and works closely with management to understand and oversee our Company's key risk exposures. For example, the Risk Committee approves the Company's risk management framework and oversees its implementation, including the processes established by management to identify, assess, measure, monitor, and manage risks. It also monitors the Company's adherence to its risk appetite. In addition, the Risk Committee oversees IRM and the performance of the Chief Risk Officer (CRO) who reports functionally to the Risk Committee and administratively to the CEO.

Additional information about our risk management, as well as the risk oversight responsibilities of the Board and its committees, including the Risk Committee, is described in the Financial Review—Risk Management section in our Annual Report on Form 10-K for the year ended December 31, 2020 and under Our Board and its Committees in this proxy statement.

As part of the Board's and its committee's annual self-evaluation process, each committee annually reviews its respective charter in light of regulatory expectations, best practices, changes in the Company's strategy, risk appetite, and identified enterprise risks, updates to our risk management framework, and director and committee feedback. As a result of its continuing review of committee responsibilities and oversight of risks, the Board has enhanced the risk oversight responsibilities of various Board committees and will continue to review their oversight responsibilities as part of its annual self-evaluation process.

The Board believes that its Board leadership structure with separate CEO and independent Chairman roles has the effect of enhancing our Board's risk oversight because of the independent Chairman's involvement in risk oversight matters, including through the Board agenda planning process. The Board also believes that Mr. Scharf's experience and leadership of the Company's business, including strategy aligned with risk, significantly contributes to our Board's understanding and appreciation of risk issues.

126.   The 2021 Proxy was false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the

Discrimination Misconduct, numerous false and misleading statements alleged herein and the Individual Defendant's failures to report violations of the Code of Conduct.

127.   The 2021 Proxy also called for shareholder approval of, among other things: (1) the election of 12 director nominees named in the proxy statement; (2) voting on an advisory resolution to approve executive compensation; and (3) voting on shareholder proposals.

128.   The Individual Defendants caused the 2021 Proxy to be false and misleading because they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (i) the Company was not complying with its diverse hiring policies and was misleading the public to believe that it was committed to improving diversity in its workplace; (ii) Wells Fargo was engaged in the Discrimination Misconduct; (iii) the foregoing conduct subjected Wells Fargo to an ongoing criminal investigation and an increased risk of regulatory and/or governmental scrutiny and enforcement action; (iv) all of the foregoing, once revealed, was likely to negatively impact Wells Fargo's reputation; and (v) the Company failed to maintain adequate internal controls. As a result of that, the Company's public statements were materially false and misleading at all relevant times.

**April 14, 2021 News Release**

129.   Wells Fargo issued a news release reporting its first quarter 2021 results on April 14, 2021. That news release quoted Defendant Scharf, who stated, in relevant part:

> We are keenly focused on the priorities I outlined last quarter. Our work to build the appropriate risk and control environment remains our top priority. This is a multiyear effort and there is still much to do, but I am confident we are making progress, though it is not always a straight line. We are steadfast in our commitment to do this work which should ultimately satisfy our regulatory obligations[.]

**May 5, 2021 Form 10-Q**

130. On May 5, 2021, Wells Fargo filed its quarterly report for the fiscal quarter ended on March 31, 2021 on Form 10-Q with the SEC (the "1Q21 10-Q"). The filing contained SOX certifications signed by Defendant Scharf and Defendant Santomassimo attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

131. The filing mentioned, in relevant part, that "Wells Fargo's top priority remains meeting its regulatory requirements to build the right foundation for all that lies ahead", and that, "[w]hile we still have significant work to do, the Company is committed to devoting the resources necessary to operate with strong business practices and controls, maintain the highest level of integrity, and have an appropriate culture in place."

**May 10, 2021 Wells Fargo News Release**

132. Wells Fargo issued a news release titled "Wells Fargo Joins OneTen Coalition to Hire, Upskill and Advance Black and African American Talent in the U.S" on May 10, 2021. That press release stated, in relevant part:

OneTen is a coalition "committed to ensuring that Black and African American talent with the skills and aptitude to earn success also have the opportunity to achieve success." OneTen's mission aligns with commitments set by Wells Fargo to create a more diverse, inclusive and equitable workforce at the company. These commitments include:
- Increasing recruiting staff for outreach to diverse communities
- Partnering with senior leaders to enhance focus on recruiting, promotion and development programs for diverse talent
- Expanding participation in national diversity events, along with a commitment to potentially interview and hire on the spot
- Requiring senior leaders to identify and engage with external diversity focused
- organizations related to their line of business or function
- Increasing focus on skills-based hiring
- Factoring DE&I [Diversity, Equity, and Inclusion] metrics into senior leader compensation

*          *          *

Wells Fargo . . . will begin the onboarding process that includes determining the number of jobs, geographic locations, new hires and promotions the company will target as part of the commitment . . . . Wells Fargo also will participate in quarterly Community of Practice gatherings that bring the leadership of coalition companies together to inspire and share information and best practices as each works to achieve goals of this commitment.

133.   The news release also quoted Defendant Santos, who represented:

As we continue to drive change at Wells Fargo, we are excited to join the OneTen coalition, which can play a significant role in our efforts to advance diversity, equity and inclusion at the company and in the communities we serve . . . . We are looking forward to working with OneTen to find ways to alleviate some of the barriers that hinder advancement.

134.   Furthermore, the May 10, 2021 news release quoted Defendant Sanchez, who stated:

Joining this coalition gives Wells Fargo another great resource and partner to reach diversity and inclusion goals in our workforce . . . . OneTen brings a unique approach to sourcing talent and we are looking forward to working with the team to expand employment opportunities and identify a broader pool of talented candidates who are a great match for Wells Fargo positions.

**July 14, 2021 Wells Fargo News Release**

135.   Wells Fargo issued a news release, on July 14, 2021, which reported its second quarter 2021 results. That news release quoted Defendant Scharf, who stated, in relevant part: "Our top priority continues to be building an appropriate risk and control infrastructure for a company of our size and complexity and we continue to invest in additional resources and devote significant management attention to this work."

**July 28, 2021 Form 10-Q**

136.   On July 28, 2021, Wells Fargo filed a quarterly report for the fiscal quarter ended June 30, 2021, on Form 10-Q with the SEC (the "2Q21 10-Q"). The filing contained SOX certifications signed by Defendant Scharf and Defendant Santomassimo attesting to the accuracy of the financial statements contained therein, the disclosure of any material

changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

137.   The 2Q21 contained the same statements as referenced in ¶ 191, supra, regarding the Company's purported commitment to compliance, strong business practices and controls, maintaining the highest level of integrity, and proper workplace culture.

**October 14, 2021, Wells Fargo News Release**

138.   Wells Fargo issued a news release, on October 14, 2021, which reported its third quarter 2021 results. That news release quoted Defendant Scharf, who stated, in relevant part:

> We are a different company today and the operational and cultural changes we've made are enabling us to execute with significantly greater discipline than we have in the past. I believe we are making significant progress [in our compliance practices], and I remain confident in our ability to continue to close the remaining gaps over the next several years, though we may continue to have setbacks along the way[.]

**November 1, 2021 Form 10-Q**

139.   On November 1, 2021, Wells Fargo filed its quarterly report for the fiscal quarter ended on September 30, 2021 on Form 10-Q with the SEC (the "3Q21 10-Q"). The filing contained SOX certifications signed by Defendant Scharf and Defendant Santomassimo attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

140.   That filing contained the same statements as referenced in ¶ 191, supra, regarding the Company's purported commitment to compliance, strong business practices and controls, maintaining the highest level of integrity, and proper workplace culture.

**January 14, 2022 Wells Fargo News Release**

141.   Wells Fargo issued a news release, on January 14, 2022, reporting its fourth quarter 2021 results. That news release quoted Defendant Scharf, who stated, in relevant part:

We have made sweeping changes to the leadership and culture, made significant progress on our risk, regulatory, and control work, improved the efficiency of the company while investing in our business in a more holistic and aggressive way, and have taken a different approach to our customer- and community-facing responsibilities as a large public company.

\*                    \*                    \*

[W]e continue our work to put exposures related to our historical practices behind us[.]

**February 22, 2022 Form 10-K**

142.   On February 22, 2022, Wells Fargo filed its annual report with the SEC announcing its financial and operating results for the quarter and year ended December 31, 2021 on a Form 10-K (the "2021 10-K"). The 2021 10-K was signed by Defendants Scharf, Santomassimo, Black, Chancey, Clark, Craver, Hewett, Morris, Payne, Pujadas, Sargent and Vautrinot. The 2021 10-K contained SOX certifications signed by Defendants Scharf and Santomassimo attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

143.   The 2021 10-K contained substantively the same statements as referenced in ¶¶ 173-175, supra, regarding the Company's purported commitment to diversity and related hiring practices.

144.   The 2021 10-K, to show that Wells Fargo had continued to successfully implement its expanded Diverse Search Requirement, stated, in relevant part, that on December 31, 2021, "[o]ur global workforce was 53% female and 47% male, and our U.S. workforce was 56% female and 44% male", and that "[o]ur U.S. workforce was 55% Caucasian/white and 45% racially/ethnically diverse."

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**March 14, 2022 Proxy Statement**

145.   On March 14, 2022, the Company filed the 2022 Proxy. Defendants Scharf, Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, Sargent, and Vautrinot solicited the 2022 Proxy which contained material misstatements and omissions.

146.   The 2022 Proxy made various representations regarding the Company's Diverse Search Requirement, including, *inter alia*, that "[o]ur DE&I commitments include a focus on hiring, promotions, and retention, and have been designed with increased accountability across those areas", including "Diversity Sourcing and Interview Team Guidelines that require diverse candidate slates and interview teams for designated posted positions"; that "[w]e seek to recruit the best and brightest talent with a keen focus on diversity for senior-level roles" and "pursue this goal by establishing trusted partnerships with candidates, hiring managers, and recruiting consultants"; and that "[w]e conduct and track targeted outreach efforts to underutilized populations in order to attract well-qualified individuals to apply for open positions and identify placement goals to help focus recruitment strategies toward underrepresented groups."

147.   The 2022 Proxy stated the following with regards to New Operating Committee Role and Clear Accountability of Operating Committee Members for Diversity & Inclusion efforts:

> In November 2020, a new Operating Committee-level role reporting directly to our CEO was created to lead DE&I efforts. In this role, our Head of Diverse Segments, Representation and Inclusion (DSRI) is responsible for driving a Company-wide DE&I strategy to increase diverse representation at all levels of the Company, create a more inclusive workplace environment, and better serve and grow our diverse customer segments and diverse suppliers across all lines of business. In partnership with our CEO and other members of the Operating Committee, including our Head of Human Resources, our line of business CEOs and diverse segment teams, our Head of DSRI and his organization lead the DE&I priorities within our Company and the communities in which we operate.
>
> As part of the year-end performance evaluation and compensation decision process, our CEO is evaluated on progress to advance DE&I Company-wide.

31

Operating Committee members are evaluated based on their progress in improving diverse representation and inclusion in their areas of responsibility.

148.   With respect to the Company's Code of Conduct, the 2022 Proxy stated that: "Our Code of Ethics and Business Conduct [is] applicable to our employees, including our executive officers, and directors."

149.   It further stated that:

Our Code of Ethics and Business Conduct provides the principles and additional guidance to support ethical actions and decisions expected of all employees and members of our Board. The Code is supported by underlying policies, the Employee Handbook, and an annual interactive online training that employees are required to complete. Members of the Board must also acknowledge, on annual basis, their obligations under the Code of Ethics and Business Conduct.

150.   With regards to the Company's Non-Retaliation Policy, the 2022 Proxy stated that:

Under our Speak Up and Non-Retaliation Policy, Wells Fargo does not tolerate retaliation of any kind. Our employees' commitment and integrity are important to the success of Wells Fargo. Our leadership believes it is critical that everyone feels safe to raise a concern and cooperate with investigations without fear of retaliation. By speaking up when they have a concern, our employees demonstrate their responsibility to act with honesty and integrity and contribute to Wells Fargo's ethical working environment. In this culture, every employee's voice matters, regardless of role, position in the Company, or location.

Employees are expected to adhere to the Code of Ethics and Business Conduct and supporting policies, speak up when they have questions, and report suspected unethical behavior. To report a concern, employees may talk to a manager, contact Employee Relations, or contact our confidential EthicsLine.

151.   Regarding the "Board of Directors' Oversight Role in Diversity & Inclusion initiatives," the 2022 Proxy said:

The Board and its Human Resources Committee oversee the Company's DE&I strategy and monitor its activities and progress.

*          *          *

Each line of business has a Diverse Segment Leader, a senior role that dually reports to the Head of DSRI and the Operating Committee member for the

respective line of business. Diverse Segment Leaders are principally responsible for executing the Company's effort to better serve and grow our diverse customer segments in each line of business.

152.   Regarding the Company's Diverse Hiring Practices, the 2022 Proxy said:

Our recruitment and career development practices are designed to support our employees and promote DE&I in our workforce, including leadership positions. In order to help identify and attract diverse talent, we employ selection processes intended to maintain a fair and equitable hiring process. Our talent strategy focuses on attracting, hiring, and supporting diverse talent. In addition, we have dedicated teams to enhance our efforts across multiple dimensions of diversity.

153.   The 2022 Proxy was false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Discrimination Misconduct, numerous false and misleading statements alleged herein and the Individual Defendant's failures to report violations of the Code of Conduct.

154.   The 2022 Proxy also called for shareholder approval of, among other things: (1) the election of 14 director nominees named in the proxy statement; (2) voting on an advisory resolution to approve executive compensation; and (3) voting on seven shareholder proposals.

155.   The Individual Defendants caused the 2022 Proxy to be false and misleading because they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Director-Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (i) the Company was not complying with its diverse hiring policies and was misleading the public to believe that it was committed to improving diversity in its workplace; (ii) Wells Fargo was engaged in the Discrimination Misconduct; (iii) the foregoing conduct subjected Wells Fargo to an ongoing criminal investigation and an increased risk of regulatory and/or governmental scrutiny and enforcement action; (iv) all of the foregoing, once revealed, was likely to negatively impact Wells Fargo's

reputation; and (v) the Company failed to maintain adequate internal controls. As a result of that, the Company's public statements were materially false and misleading at all relevant times.

**May 3, 2022 Form 10-Q**

156.   On May 3, 2022, Wells Fargo filed its quarterly report for the fiscal quarter ended on March 31, 2022 on Form 10-Q with the SEC (the "1Q22 10-Q"). The filing contained SOX certifications signed by Defendant Scharf and Defendant Santomassimo attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

157.   That filing contained substantively the same statements as referenced in ¶ 191, supra, regarding the Company's purported commitment to compliance, strong business practices and controls, maintaining the highest level of integrity, and proper workplace culture.

158.   The statements referenced in ¶¶ 112-158 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (i) the Company was not complying with its diverse hiring policies and was misleading the public to believe that it was committed to improving diversity in its workplace; (ii) Wells Fargo was engaged in the Discrimination Misconduct; (iii) the foregoing conduct subjected Wells Fargo to an ongoing criminal investigation and an increased risk of regulatory and/or governmental scrutiny and enforcement action; (iv) all of the foregoing, once revealed, was likely to negatively impact Wells Fargo's reputation; and (v) the Company failed to maintain adequate internal controls. As a result of that, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

**May 19, 2022 New York Times Article**

159.   The truth began emerging on May 19, 2022, when *NY Times* published an article after interviewing Wells Fargo's seven former employees.

160.   The article was titled, "At Wells Fargo, a Quest to Increase Diversity Leads to Fake Job Interviews." The article stated the details of the interview with the seven current and former Wells Fargo employees. The employees stated that the Company was engaged in wrongful conduct and discriminatory practices by conducting fake interviews.

161.   One of the former employees, Joe Bruno, who was a former executive in the Company's wealth management division stated that "[f]or many open positions, employees would interview a 'diverse' candidate", but that "that often, the so called diverse candidate would be interviewed for a job that had already been promised to someone else."

162.   It further stated that Joe Bruno "complained to his bosses" multiple times, but they "dismissed his claims" and fired him. He said, "Wells Fargo retaliated against him for telling his superiors that the fake interviews were inappropriate, morally wrong, ethically wrong."

163.   The article further stated that the employees believed that "the [fake] interviews" actually "seemed to be more about helping Wells Fargo record its diversity efforts on paper – partly in anticipation of possible regulatory audits – rather than hiring more women or people of color."

164.   Wells Fargo's Head of Corporate Reputation Communication, who is a trusted advisor to the CEO and the executive leadership team, stated in the *NY Times* article that "she was aware that informal directives about hiring diverse candidates had long circulated inside the bank. But those rules were from an earlier era..."

165.   On this news, Wells Fargo's common stock price fell from $42.00 per share on the closing on May 19, 2022, to $41.67 per share on the closing on May 20, 2022. The stock fell 1.04% and $0.44 per share. Even though there was a decline, Wells Fargo's

common stock continued to trade at artificially inflated prices throughout the remainder of the Relevant Period because the Individual Defendants continued to mislead and omit Company's compliance with its expanded Diverse Search Requirement policies.

166.   One of those instances was when Wells Fargo published a 2022 Diversity, Equity, and Inclusion Report on June 3, 2022. The report stated, in relevant part, regarding Company's Diverse Search Requirement:

> For most posted roles in the U.S. with total direct compensation greater than $100,000 per year, Wells Fargo requires that at least 50% of the interview candidates must represent a historically underrepresented group with respect to at least one diversity dimension and at least one interviewer on the hiring panel must also represent a historically underrepresented group with respect to at least one diversity dimension.

> Outside the U.S., Wells Fargo has country-specific strategies in place to ensure that the company is considering a diverse pool of candidates.

### The Truth Fully Emerges

### June 6, 2022 Reuters Article

167.   The truth started to fully emerge on June 6, 2022, when *Reuters* published an article titled "Wells Fargo pauses diverse slate hiring policy after reports of fake job interviews." The article stated that "Wells Fargo . . . is pausing a hiring policy that requires recruiters to interview a diverse pool of candidates, after the New York Times reported such interviews were often fake and conducted even though the job had already been promised to someone else."

168.   The article further stated that "[t]he bank also plans to conduct a review of its diverse slate guidelines, Chief Executive Officer Charles Scharf told staff on Monday, according to a memo seen by Reuters."

169.   The article also stated that "Scharf said the bank will continue to actively seek diversity in hiring even during this pause, and upon completion of the review, will make adjustments to its diverse slate program where appropriate and relaunch it in July."

**June 9, 2022 New York Times Article**

170.    On June 9, 2022, the *NY Times* published an article titled "Federal Prosecutors Open Criminal Inquiry of Wells Fargo's Hiring Practices." The article stated, in relevant part:

> Federal prosecutors in New York have opened a criminal investigation into whether Wells Fargo violated federal laws by conducting sham interviews of minority and female job candidates, according to two people with knowledge of the inquiry.

> The investigation is being conducted by members of a newly created civil rights unit inside the criminal division of the Manhattan U.S. attorney's office, the people said.

> *            *            *

> At Wells Fargo, one of the nation's largest banks, with nearly 250,000 employees, sham interviews occurred across multiple business lines, including its mortgage servicing, home lending and retail banking operations. The Times report last month focused on the bank's wealth management business.

> Since then, another 10 current and former employees have shared stories about how they were subject to fake interviews, or conducted them, or saw paperwork documenting the practice. The people spoke on the condition of anonymity because they feared retaliation from Wells Fargo or their current employers.

> *            *            *

> In some instances, there were written records of the practice of conducting fake interviews.

**June 9, 2022 Press Release**

171.    On June 9, 2022, after hours, Wells Fargo issued a press release titled "Wells Fargo response to New York Times article." In the press release, Wells Fargo stated that it has paused its Diverse Search Requirement policies and is reviewing the guidelines. The press release stated, in relevant part:

"No one should be put through an interview without a real chance of receiving an offer, period. The diverse slate guidelines we put in place are meant to increase diverse representation across the company . . . .

At the same time, it's important that implementation of our guidelines is consistent. Earlier this week, the company temporarily paused the use of its diverse slate guidelines. During this pause, the company is conducting a review so that hiring managers, senior leaders and recruiters fully understand how the guidelines should be implemented – and so we can have confidence that our guidelines live up to their promise."

172.   After Wells Fargo's press release, in which it disclosed its plan to pause the diverse slate guidelines, the Company's stock fell to $38.99 per share on the closing on June 13, 2022, from $42.67 per share on the closing on June 9, 2022. The stock fell $8.62% or $3.68 per share.

## Repurchases During the Relevant Period

173.   During the period in which the Company made false and or misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company, which overpaid an aggregate amount of nearly $4.1 billion for repurchases of its own stock during the Relevant Period.

174.   According to the 1Q21 10-Q, within the Relevant Period during the three months ended March 31, 2021, the Individual Defendants caused the Company to, in March 2021, repurchase 5,599,343 shares of its own common stock at an average price per share of approximately $39.71, for a total cost to the Company of approximately $222.4 million.

175.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $0.72 more than the actual worth of each share within the Relevant Period during March 2021. Thus, the total over payment by the Company for

repurchases of its own stock within the Relevant Period during March 2021 was approximately $4 million.

176. According to the 2Q21 10-Q, within the Relevant Period during the three months ended June 30, 2021, the Individual Defendants caused the Company to, in April 2021, repurchase 20,075,596 shares of its own common stock at an average price per share of approximately $43.60, for a total cost to the Company of approximately $875.3 million.

177. Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $4.61 more than the actual worth of each share within the Relevant Period during April 2021. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during April 2021 was approximately $92.6 million.

178. According to the 2Q21 10-Q, within the Relevant Period during the three months ended June 30, 2021, the Individual Defendants caused the Company to, in May 2021, repurchase 10,893,389 shares of its own common stock at an average price per share of approximately $46.11, for a total cost to the Company of approximately $502.3 million.

179. Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $7.12 more than the actual worth of each share within the Relevant Period during May 2021. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during May 2021 was approximately $77.6 million.

180. According to the 2Q21 10-Q, within the Relevant Period during the three months ended June 30, 2021, the Individual Defendants caused the Company to, in June 2021, repurchase 4,352,796 shares of its own common stock at an average price per share of approximately $43.08, for a total cost to the Company of approximately $187.5 million.

181.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $4.09 more than the actual worth of each share within the Relevant Period during June 2021. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during June 2021 was approximately $17.8 million.

182.   According to the 3Q21 10-Q, within the Relevant Period during the three months ended September 30, 2021, the Individual Defendants caused the Company to, in July 2021, repurchase 36,810,627 shares of its own common stock at an average price per share of approximately $44.76, for a total cost to the Company of approximately $1.6 billion.

183.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $5.77 more than the actual worth of each share within the Relevant Period during July 2021. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during July 2021 was approximately $212.4 million.

184.   According to the 3Q21 10-Q, within the Relevant Period during the three months ended September 30, 2021, the Individual Defendants caused the Company to, in August 2021, repurchase 41,340,615 shares of its own common stock at an average price per share of approximately $43.08, for a total cost to the Company of approximately $1.7 billion.

185.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $4.09 more than the actual worth of each share within the Relevant Period during August 2021. Thus, the total over payment by the Company for

repurchases of its own stock within the Relevant Period during August 2021 was approximately $169.1 million.

186.    According to the 3Q21 10-Q, within the Relevant Period during the three months ended September 30, 2021, the Individual Defendants caused the Company to, in September 2021, repurchase 36,057,193 shares of its own common stock at an average price per share of approximately $46.18, for a total cost to the Company of approximately $1.6 billion.

187.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $7.19 more than the actual worth of each share within the Relevant Period during September 2021. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during September 2021 was approximately $259.3 million.

188.    According to the 2021 10-K, February 2, 2022, within the Relevant Period for the year ending December 31, 2021, the Individual Defendants caused the Company to, in October 2021, repurchase 36,092,310 shares of its own common stock at an average price per share of approximately $50.07, for a total cost to the Company of approximately $1.8 billion.

189.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $11.08 more than the actual worth of each share within the Relevant Period during October 2021. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during October 2021 was approximately $400 million.

190.    According to the 2021 10-K, February 2, 2022, within the Relevant Period for the year ending December 31, 2021, the Individual Defendants caused the Company to, in November 2021, repurchase 80,585,475 shares of its own common stock at an average

Verified Shareholder Derivative Complaint

price per share of approximately $50.66, for a total cost to the Company of approximately $4.1 billion.

191.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $11.67 more than the actual worth of each share within the Relevant Period during November 2021. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during November 2021 was approximately $940.4 million.

192.   According to the 2021 10-K, February 2, 2022, within the Relevant Period for the year ending December 31, 2021, the Individual Defendants caused the Company to, in December 2021, repurchase 23,001,846 shares of its own common stock at an average price per share of approximately $48.79, for a total cost to the Company of approximately $1.1 billion.

193.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $9.80 more than the actual worth of each share within the Relevant Period during December 2021. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during December 2021 was approximately $225.4 million.

194.   According to the 1Q22 10-Q, within the Relevant Period during the three months ended March 31, 2022, the Individual Defendants caused the Company to, in January 2022, repurchase 33,687,433 shares of its own common stock at an average price per share of approximately $54.55, for a total cost to the Company of approximately $1.8 billion.

195.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $15.56 more than the actual worth of each share within the

Relevant Period during January 2022. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during January 2022 was approximately $524.2 million.

196.   According to the 1Q22 10-Q, within the Relevant Period during the three months ended March 31, 2022, the Individual Defendants caused the Company to, in February 2022, repurchase 55,819,880 shares of its own common stock at an average price per share of approximately $56.70, for a total cost to the Company of approximately $3.2 billion.

197.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $17.71 more than the actual worth of each share within the Relevant Period during February 2022. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during February 2022 was approximately $988.6 million.

198.   According to the 1Q22 10-Q, within the Relevant Period during the three months ended March 31, 2022, the Individual Defendants caused the Company to, in March 2022, repurchase 20,586,039 shares of its own common stock at an average price per share of approximately $49.07, for a total cost to the Company of approximately $1 billion.

199.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $10.08 more than the actual worth of each share within the Relevant Period during March 2022. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during March 2022 was approximately $207.5 million.

200.   According to the 2Q22 10-Q, within the Relevant Period during the three months ended June 30, 2022, the Individual Defendants caused the Company to, in April

2022, repurchase 24,862 shares of its own common stock at an average price per share of approximately $47.54, for a total cost to the Company of approximately $1.2 million.

201. Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $8.55 more than the actual worth of each share within the Relevant Period during April 2022. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during April 2022 was approximately $212,570.

202. According to the 2Q22 10-Q, within the Relevant Period during the three months ended June 30, 2022, the Individual Defendants caused the Company to, in May 2022, repurchase 25,465 shares of its own common stock at an average price per share of approximately $43.63, for a total cost to the Company of approximately $1.1 million.

203. Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $4.64 more than the actual worth of each share within the Relevant Period during May 2022. Thus, the total over payment by the Company for repurchases of its own stock within the Relevant Period during May 2022 was approximately $118,158.

204. According to the 2Q22 10-Q, within the Relevant Period during the three months ended June 30, 2022, the Individual Defendants caused the Company to, in June 2022, repurchase 38,459 shares of its own common stock at an average price per share of approximately $42.45, for a total cost to the Company of approximately $1.6 million.

205. Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $3.46 more than the actual worth of each share within the Relevant Period during June 2022. Thus, the total over payment by the Company for

repurchases of its own stock within the Relevant Period during June 2022 was approximately $133,068.

## DAMAGES TO WELLS FARGO

206.   As a direct and proximate result of the Individual Defendants' misconduct, Wells Fargo has lost and expended, and will lose and expend, many millions of dollars.

207.   Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and four of the Individual Defendants, adherence to criminal investigations from DOJ and other governmental agencies and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

208.   Such losses include the Company's overpayment by nearly $4.1 billion for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

209.   Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the Discrimination Misconduct

210.   Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

211.   As a direct and proximate result of the Individual Defendants' conduct, Wells Fargo has also suffered and will continue to suffer a loss of reputation and goodwill and will be identified as a promoting discrimination that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

**THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES**

212.   By reason of their positions as officers and/or directors of the Company, each of the Individual Defendants owed and owe Wells Fargo and its stockholders fiduciary obligations of care, good faith, and loyalty, and were and are required to use their utmost ability to control and manage Wells Fargo in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of Wells Fargo's best interests and not in furtherance of their own personal interest or benefit. Each director and officer of the Company owes to Wells Fargo and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

213.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of Wells Fargo, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. To discharge their duties, the officers and directors of Wells Fargo were required to exercise reasonable and prudent supervision over the management, policies, hiring practices, controls, and operations of the Company. By virtue of such duties, the officers and directors of Wells Fargo were required to, among other things:

(a)   Conduct the affairs of the Company in an efficient, business-like manner in a fashion that complies with all state and federal laws, including Wells Fargo's Code of Ethics and Business Conduct ("Code of Conduct");

(b)   Remain informed as to how Wells Fargo conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make disclosures as necessary to comply with applicable laws;

(c)   Keep accurate records and reports of the business and internal affairs of Wells Fargo and the procedures for the reporting of the business and internal

affairs to the Board and to investigate periodically, or cause independent investigation to be made of, said reports and records;

(d)    Manage internal legal, financial, and management controls, such that Wells Fargo's operations comply with all applicable laws and Wells Fargo's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's stockholders would be accurate;

(e)    Ensure public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to publish are truthful and accurate; and

(f) Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company and its stockholders.

## DERIVATIVE ALLEGATIONS

214.   Plaintiff brings this action derivatively for the benefit of Wells Fargo to redress injuries Wells Fargo suffered and suffer as a direct result of the Individual Defendants' breaches of their fiduciary duties as directors and officers of Wells Fargo. Wells Fargo is named as a nominal defendant in this action. This is not a collusive action to confer jurisdiction in this Court that it would not otherwise have.

215.   Plaintiff has continuously been a stockholder of Wells Fargo at all relevant times. Plaintiff will adequately and fairly represent the interests of Wells Fargo in enforcing and prosecuting its rights.

## DEMAND IS EXCUSED AS FUTILE

216.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

217.   When this action was filed, Wells Fargo's Board of Directors consisted of Defendants Scharf, Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, Sargent, and Vautrinot (the "Director-Defendants") along with nonparties Richard K. Davis, Cecelia G. Marken, and Felicia F. Norwood (collectively with the Director-

Defendants, the "Directors"). Plaintiff did not make a demand on the Board to institute this action because such a demand would be futile. Plaintiff needs only to allege demand futility as to seven of fourteen Directors that were on the Board at the time this action was filed.

218.   Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause or permit Wells Fargo to engage in the Discrimination Misconduct and to make and/or cause the Company to make false and misleading statements and omissions of material facts while causing Wells Fargo to spend almost $4.1 billion to repurchase its own stock at artificially inflated prices. This renders the Director-Defendants unable to investigate the charges impartially and decide whether to pursue action against themselves and the other perpetrators of the scheme.

219.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Wells Fargo to engage in the Discrimination Misconduct and caused or permitted Wells Fargo to issue materially false and misleading statements. Specifically, the Director-Defendants caused Wells Fargo to issue false and misleading statements which were intended to make Wells Fargo appear more profitable and attractive to investors. As a result of the foregoing, demand would be futile, and thus excused, as the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested.

220.   **Defendant Scharf** - Defendant Scharf is currently the Company's CEO, President, and a director and has been since October 2019. Scharf received, and continues to receive, lucrative compensation. Therefore, as Wells Fargo admits, he is a non-independent director. As CEO, President and a director during the Relevant Period, Defendant Scharf was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company, including, *inter alia*, all public financial statements released by the Company during the Relevant Period. Additionally, Defendant Scharf solicited the 2021 Proxy and 2022 Proxy which both

contained false and misleading statements that led to stockholders approving, on an advisory basis, his unjust compensation.

221.   As the Company's highest officer and as a Director, Defendant Scharf failed to oversee Wells Fargo's Discrimination Misconduct, Wells Fargo's scheme to make false and misleading statements, and consciously disregarded his duties to monitor internal controls over financial reporting. Moreover, Defendant Scharf failed to oversee the Operating Committee's duties of ensuring the success of the Diversity and Inclusion Program. Furthermore, Defendant Scharf is a defendant in the Class Action. As a result, Defendant Scharf breached his fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Scharf is futile and excused.

222.   **Defendant Black** - Defendant Black is currently a Company director and has been since April 2020. Since August 2021, Defendant Black has served as Chair of the Board. He also serves as the Chair of the Finance Committee and as a member of the Human Resources Committee. Additionally, Defendant Black solicited the 2021 and 2022 Proxy Statements which contained false and misleading statements that led to stockholders reelecting him to the Board.

223.   As Chair of the Board, Chair of the Finance Committee, and as a member of the Human Resources Committee, Defendant Black failed to oversee Wells Fargo's Discrimination Misconduct, Wells Fargo's scheme to make false and misleading statements, and consciously disregarded his duties to monitor internal controls over financial reporting.   Moreover, Defendant Black voted against various shareholder diversity proposals in the 2021 Proxy Statement with knowledge of the Company's history of discrimination lawsuits. As a result, Defendant Black breached his fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon him is futile and excused.

224.   **Defendant Sargent** - Defendant Sargent is currently a Company director and has been since 2017. Defendant Sargent also serves as the Chair of the Human Resources

Committee. Additionally, Defendant Sargent solicited the 2021 and 2022 Proxy Statements which contained false and misleading statements that led to stockholders reelecting him to the Board.

225.   As Chair of the Human Resources Committee, Defendant Sargent failed to oversee Wells Fargo's Discrimination Misconduct, Wells Fargo's scheme to make false and misleading statements, and consciously disregarded his duties to monitor internal controls over financial reporting. Moreover, Defendant Sargent voted against various shareholder diversity proposals in the 2021 Proxy Statement with knowledge of the Company's history of discrimination lawsuits. As a result, Defendant Sargent breached his fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon him is futile and excused.

226.   **Defendant Hewett** - Defendant Hewett is currently a Company director and has been since 2019. Defendant Hewett also serves as a member of the Human Resources Committee. Additionally, Defendant Hewett solicited the 2021 and 2022 Proxy Statements which contained false and misleading statements that led to stockholders reelecting him to the Board.

227.   As a member of the Human Resources Committee, Defendant Hewett failed to oversee Wells Fargo's Discrimination Misconduct, Wells Fargo's scheme to make false and misleading statements, and consciously disregarded his duties to monitor internal controls over financial reporting. Moreover, Defendant Hewett voted against various shareholder diversity proposals in the 2021 Proxy Statement with knowledge of the Company's history of discrimination lawsuits. As a result, Defendant Hewett breached his fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon him is futile and excused.

228.   **Defendant Morris** - Defendant Morris is currently a Company director and has been since 2018. Defendant Morris also serves as a member of the Human Resources Committee. Additionally, Defendant Morris solicited the 2021 and 2022 Proxy Statements

which contained false and misleading statements that led to stockholders reelecting her to the Board.

229.   As a member of the Human Resources Committee, Defendant Morris failed to oversee Wells Fargo's Discrimination Misconduct, Wells Fargo's scheme to make false and misleading statements, and consciously disregarded her duties to monitor internal controls over financial reporting. Moreover, Defendant Morris voted against various shareholder diversity proposals in the 2021 Proxy Statement with knowledge of the Company's history of discrimination lawsuits. As a result, Defendant Morris breached her fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon her is futile and excused.

230.   **Defendant Craver** - Defendant Craver is currently a Company director and has been since 2018. Defendant Craver also serves as the Chair of the Audit Committee. Additionally, Defendant Craver solicited the 2021 and 2022 Proxy Statements which contained false and misleading statements that led to stockholders reelecting him to the Board.

231.   As the Chair of the Audit Committee, Defendant Craver failed to oversee Wells Fargo's Discrimination Misconduct, Wells Fargo's scheme to make false and misleading statements, and consciously disregarded his duties to monitor internal controls over financial reporting. Moreover, Defendant Craver voted against various shareholder diversity proposals in the 2021 Proxy Statement with knowledge of the Company's history of discrimination lawsuits. As a result, Defendant Craver breached his fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon him is futile and excused.

232.   **Defendant Chancy** - Defendant Chancy is currently a Company director and has been since 2020. Defendant Chancy also serves as a member of the Audit Committee and the Risk and Finance Committee. Additionally, Defendant Chancy solicited the 2021

and 2022 Proxy Statements which contained false and misleading statements that led to the stockholders reelecting him to the Board.

233.   As a member of the Audit Committee and the Risk and Finance Committee, Defendant Chancy failed to oversee Wells Fargo's Discrimination Misconduct, Wells Fargo's scheme to make false and misleading statements, and consciously disregarded his duties to monitor internal controls over financial reporting. Moreover, Defendant Chancy voted against various shareholder diversity proposals in the 2021 Proxy Statement with knowledge of the Company's history of discrimination lawsuits. As a result, Defendant Chancy breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon him is futile and excused.

234.   **Defendant Clark** - Defendant Clark is currently a Company director and has been since January 2018. Defendant Clark also serves as a member of the Corporate Responsibility Committee and the Governance and Nominating Committee. Additionally, Defendant Clark solicited the 2021 and 2022 Proxy Statements which contained false and misleading statements that led to several of the Individual Defendants' reelection to the Board.

235.   As a member of the Corporate Responsibility Committee and the Governance and Nominating Committee, Defendant Clark failed to oversee Wells Fargo's Discrimination Misconduct, Wells Fargo's scheme to make false and misleading statements, and consciously disregarded her duties to monitor internal controls over financial reporting. Moreover, Defendant Clark voted against various shareholder diversity proposals in the 2021 Proxy Statement with knowledge of the Company's history of discrimination lawsuits. As a result, Defendant Clark breached her fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon her is futile and excused.

236.   **Defendant Payne** - Defendant Payne is currently a Company director and has been since October 2019. Defendant Payne serves as the Chair of the Credit Subcommittee

and as a member of the Risk Committee. Additionally, Defendant Payne solicited the 2021 and 2022 Proxy Statements which contained false and misleading statements that led to the stockholders reelecting him to the Board.

237.   As the Chair of the Credit Subcommittee and as a member of the Risk Committee, Defendant Payne failed to oversee Wells Fargo's Discrimination Misconduct, Wells Fargo's scheme to make false and misleading statements, and consciously disregarded his duties to monitor internal controls over financial reporting. Moreover, Defendant Payne voted against various shareholder diversity proposals in the 2021 Proxy Statement with knowledge of the Company's history of discrimination lawsuits. As a result, Defendant Payne breached his fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon him is futile and excused.

238.   **Defendant Pujadas** - Defendant Pujadas is currently a Company director and has been since September 2017. Defendant Pujadas serves as a member of the Finance Committee and the Risk Committee. Additionally, Defendant Pujadas solicited the 2021 and 2022 Proxy Statements, which contained false and misleading statements that led to the stockholders reelecting him to the Board.

239.   As a member of the Finance Committee and Risk Committee, Defendant Pujadas failed to oversee Wells Fargo's Discrimination Misconduct, Wells Fargo's scheme to make false and misleading statements, and consciously disregarded his duties to monitor internal controls over financial reporting. Moreover, Defendant Pujadas voted against various shareholder diversity proposals in the 2021 Proxy Statement with knowledge of the Company's history of discrimination lawsuits. As a result, Defendant Pujadas breached his fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon him is futile and excused.

240.   **Defendant Vautrinot** - Defendant Vautrinot is currently a Company director and has been since February 2015. Defendant Vautrinot serves as a member of the Corporate Responsibility Committee and the Risk Committee. Additionally, Defendant

Vautrinot solicited the 2021 and 2022 Proxy Statements which contained false and misleading statements that led to several of the Individual Defendants to be reelected by the shareholders.

241.   As a member of the Corporate Responsibility Committee and the Risk Committee, Defendant Vautrinot failed to oversee Wells Fargo's Discrimination Misconduct, Wells Fargo's scheme to make false and misleading statements, and consciously disregarded her duties to monitor internal controls over financial reporting. Moreover, Defendant Vautrinot voted against various shareholder diversity proposals in the 2021 Proxy Statement with knowledge of the Company's history of discrimination lawsuits. As a result, Defendant Vautrinot breached her fiduciary duties, faces a likelihood of liability, and is not independent or disinterested. Thus, demand upon her is futile and excused.

242.   **Additional Allegations of Demand Futility as to Defendants Craver, Chancy, and Sargent** – Defendants Craver, Chancy, and Sargent (collectively, the "Audit Committee Defendants"), served as members of the Audit Committee at all relevant times. As such, they are responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Discrimination Misconduct, to disseminate materially false and misleading statements to the public, and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act.

243.   In addition, the Audit Committee Defendants violated the Audit Committee Charter by failing to: oversee the integrity of the Company's financial disclosures adequately; oversee the Company's compliance with legal and regulatory requirements adequately; oversee the Company's risk assessments and risk management adequately; discuss with management the Company's financial information prior to public distribution

adequately; and oversee the Company' disclosure controls and procedures adequately. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

244.   The Individual Defendants' conduct described herein was not the product of legitimate business judgment. It was based on bad faith and intentional, reckless, or disloyal misconduct. Therefore, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).

245.   Wells Fargo has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Wells Fargo any part of the damages Wells Fargo suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

246.   The acts complained of herein constitute violations of fiduciary duties owed by Wells Fargo's officers and directors, and these acts are incapable of ratification.

247.   As all of the Director-Defendants, and if not all at least a majority of the Directors, face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

248.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least seven of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**

**Against Defendants Scharf, Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, Sargent, and Vautrinot for Violations of Section 14(a) of the Exchange Act**

249.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

250.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

251.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

252.   Under the direction and watch of the Defendants Scharf, Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, Sargent, and Vautrinot, the 2021 and 2022 Proxy Statements failed to disclose that: (i) the Company was not complying with its diverse hiring policies and was misleading the public to believe that it was committed to improving diversity in its workplace; (ii) Wells Fargo was engaged in the Discrimination Misconduct; (iii) the foregoing conduct subjected Wells Fargo to an ongoing criminal investigation and an increased risk of regulatory and/or governmental scrutiny and enforcement action; (iv) all of the foregoing, once revealed, was likely to negatively impact Wells Fargo's reputation; and (v) the Company failed to maintain adequate internal

controls. As a result of that, the Company's public statements were materially false and misleading at all relevant times.

253.   Moreover, the 2021 and 2022 Proxy Statements failed to disclose that the Board's oversight and risk mechanisms were not adequate given the aforementioned misconduct and that the Code of Conduct was not complied with.

254.   Defendants Scharf, Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, Sargent, and Vautrinot knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2021 Proxy Statement, including but not limited to, the election of directors.

255.   Defendants Scharf, Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, Sargent, and Vautrinot knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including but not limited to, the election of directors.

256.   The false and misleading elements of the 2021 Proxy Statement, led Company shareholders to, *inter alia*: (1) elect Defendants Scharf, Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, Sargent, and to the Board, allowing them to continue or being breaching their fiduciary duties to the Company and (2) approve, via non-binding advisory vote, the compensation of the Company's named executive officers, including Defendants Scharf, Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, Sargent, and Vautrinot, who were breaching their fiduciary duties to the Company.

257.   The false and misleading elements of the 2022 Proxy Statement, led Company shareholders to, *inter alia*: (1) elect Defendants Scharf, Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, Sargent, and to the Board, allowing them to continue or

being breaching their fiduciary duties to the Company and (2) approve, via non-binding advisory vote, the compensation of the Company's named executive officers, including Defendants Scharf, Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, Sargent, and Vautrinot, who were breaching their fiduciary duties to the Company.

258.   The Company was damaged as a result of Defendants Scharf, Black, Chancy, Clark, Craver, Hewett, Morris, Payne, Pujadas, Sargent, and Vautrinot's material misrepresentations and omissions in the 2021 and 2022 Proxy Statements.

259.   Plaintiff on behalf of Wells Fargo has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

260.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

261.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Wells Fargo's business and affairs.

262.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

263.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Wells Fargo.

264.   In breach of their fiduciary duties, the Individual Defendants caused or permitted the Company to engage in the Discrimination Misconduct.

265.   Moreover, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Wells Fargo's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or

caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (i) the Company was not complying with its diverse hiring policies and was misleading the public to believe that it was committed to improving diversity in its workplace; (ii) Wells Fargo was engaged in the Discrimination Misconduct; (iii) the foregoing conduct subjected Wells Fargo to an ongoing criminal investigation and an increased risk of regulatory and/or governmental scrutiny and enforcement action; (iv) all of the foregoing, once revealed, was likely to negatively impact Wells Fargo's reputation; and (v) the Company failed to maintain adequate internal controls. As a result of that, the Company's public statements were materially false and misleading at all relevant times.

266. The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

267. Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

268. In yet further breach of their fiduciary duties, during the Relevant Period, one of the Individual Defendants engaged in a lucrative insider sale, netting proceeds of approximately $1 million, while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

269. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

270.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the Discrimination Misconduct and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in Discrimination Misconduct, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the Discrimination Misconduct and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in an insider sale. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

271.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

272.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Wells Fargo has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

273.   Plaintiff on behalf of Wells Fargo has no adequate remedy at law.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Wells Fargo, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Wells Fargo;

(c)   Determining and awarding to Wells Fargo the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly

and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Wells Fargo and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Wells Fargo and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Wells Fargo to nominate at least seven candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Wells Fargo restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Verified Shareholder Derivative Complaint

Dated: September 26, 2022

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By:  /s/Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Charles Rogers am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of 9/9/2022 _____, 2022.

Charles David Rogers
118B0CF358814F3...
Charles Rogers